IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **KEITH DOHSE,** | ) | |
| | ) | |
| Plaintiff, | ) | 8:04CV355 |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| **JOHN E. POTTER, United States** | ) | |
| **Postal Service Postmaster General,** | ) | |
| | ) | |
| Defendant. | ) | |

     This matter is before the court on the defendant's Motion for Summary Judgment (Filing No. 100). The defendant filed a brief (Filing No. 104) and an index of evidence (Filing Nos. 101-103) in support of the motion. The plaintiff filed a brief (Filing No. 109) in opposition to the motion. The defendant filed a brief (Filing No. 111) in reply. For the reasons stated below, the court concludes the defendant's motion should be granted.

### INTRODUCTION

     This case arises from the plaintiff's permanent denial of access to the mail on May 9, 2003. At all relevant times, the plaintiff was an independent contractor for the United States Postal Service (USPS) based on two highway contract routes (HCR) in and around Gordon, Sheridan County, Nebraska. **See** Filing No. 37 - Amended Complaint ¶ 7. The plaintiff alleges that during the performance of his contracts he was regularly harassed by USPS employees, including illegal telephone taps, interference with the plaintiff's relationships with postal customers and interference with the plaintiff's performance of his contracts. *Id.* ¶¶ 13-14. The plaintiff was placed under investigation by USPS on March 20, 2003, based on allegations the plaintiff made verbal threats against USPS employees. *Id.* ¶ 15. At that time, the plaintiff was temporarily denied access to the mails. *Id.* ¶ 15. He appealed the decision, but was later permanently refused access to the mails.

     The plaintiff argues he did not receive adequate notice detailing the reasons for his denial of access or an opportunity to defend his position. *Id.* ¶ 20. The plaintiff brought claims for denial of constitutional due process and claims under the Freedom of Information Act (FOIA) and the Privacy Act. On February 15, 2006, the plaintiff's FOIA and Privacy Act

claims were dismissed.  **See** Filing No. 50.  The defendant now seeks summary judgment on the plaintiff's constitutional claim.  The defendant argues the plaintiff did not have a property interest in his contract, but in any event, the appeals process available to the plaintiff was adequate.  **See** Filing No. 104.  The plaintiff counters he had either a property interest in his contract or should be considered a USPS employee.  The plaintiff further contends he was entitled to a pre-termination opportunity to be heard.  Finally, the plaintiff argues he was unconstitutionally terminated for engaging in constitutionally protected speech.  **See** Filing No. 109.

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331[1], as the matter arises under the Constitution and laws of the United States as a federal question. The undersigned magistrate judge is specially designated to exercise jurisdiction over this matter, pursuant to 28 U.S.C. § 636 and after the consent of the parties.  **See** Filing No. 63.

## UNCONTROVERTED FACTS[2]

1. At all times relevant to the plaintiff's Complaint, the plaintiff held two separate contracts with the Postal Service for the delivery of mail on two highway routes based out of the Gordon, Nebraska Post Office.  Those two contracts were Highway Contract Routes (HCR) 69384 and 69362.  **See** Filing No. 102 Ex. 2 - Gail M. Duba Decl. ¶ 2; Filing No. 101 Ex. 1 - Les R. Carpenter Decl. ¶ 4 and Attachments A-C.

2. Since the plaintiff was a contract holder, not an employee of the Postal Service, the Postal Service Distribution Networks Office, Western Area - Denver (Denver Contracting Office) administered the contracts and held oversight responsibilities.  The Denver Contracting Office was in charge of all transportation and contract routes for the

---

[1]The Postal Reorganization Act (PRA), 39 U.S.C. § 401(1), provides that the USPS may "sue and be sued" in its own name. "[T]he United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." 39 U.S.C. § 409(a). Under the PRA, "the rules of procedure adopted under title 28 for suits in which the United States, it officers, or employees are parties, shall apply in like manner to suits in which the Postal Service, its officers, or employees are parties." 39 U.S.C. § 409(b).

[2]The plaintiff did not object to any of the defendant's statements of fact, either formally or by way of argument. Accordingly, the facts are uncontroverted and deemed admitted. **See** NECivR 56.1(b)(1).

entire western area, which included highway contract holders, such as the plaintiff.  **See** Duba Decl. ¶ 2; Carpenter Decl. ¶¶ 2-3.

      3.     The Postmaster in Gordon served as the Contracting Officer's Representative (COR).  A COR responds to the contractor's (in this case the plaintiff's) questions relative to delivering the mail.  A COR reports any deficiencies, concerns, or praises to the Denver Contracting Office.  **See** Duba Decl. ¶ 2.

      4.     On or about March 13, 2003, Gail Duba, Manager, Operations Support for the Postal Service, learned that an Omaha FBI Agent had been contacted by John Oliver (PI Oliver), a private investigator in Scottsbluff, Nebraska.  PI Oliver reported the plaintiff had hired him for help with personal concerns.  The plaintiff had been in telephone contact with PI Oliver for about six months and PI Oliver expressed concerns about disturbing statements made by the plaintiff.  **See** Duba Decl. ¶ 4; Filing No. 103 - John Oliver Decl. ¶ 4.

      5.     The plaintiff requested that PI Oliver investigate a variety of matters for him, including: the plaintiff's belief that his phone and his aunt's phone were being unlawfully "bugged" by either a neighbor who worked for the phone company, his uncle, or law enforcement; his belief that this ill-gotten information was being used to harm him in some way by his dentist, his coworkers at the post office, and by others in the community; his belief that there was an attempt to injure him by employees at a local grocery store by causing him to slip on a slippery substance in the aisle of that store; his belief that he received poor treatment from the postmaster and other co-workers at the post office; and his belief that all of these people that have harmed him needed to be brought to justice. At one time, the plaintiff indicated to PI Oliver that he intended to seek millions of dollars for harm done to him by these various people and entities.  PI Oliver spoke to the plaintiff approximately 30 times in six months.  On a few occasions, PI Oliver met with the plaintiff in person, including one visit to his home.  The plaintiff frequently made disturbing comments where he made veiled threats of doing violent acts if some of his concerns were not resolved.  Specifically, the plaintiff made threats of violence against the Gordon Postmaster and other postal employees.  The plaintiff also made threats against his neighbor who worked for the telephone company and whom, he believed, was bugging his telephone.  On a couple of occasions, PI Oliver taped the telephone conversations without

3

the plaintiff's knowledge. PI Oliver turned those tapes over to the Postal Service. **See** Oliver Decl. ¶¶ 2, 3, 5, 8.

  6. On or about March 14, 2003, Manager Duba spoke with PI Oliver by telephone. PI Oliver told Manager Duba that he was very concerned due to his conversations with the plaintiff and the number of threats made by the plaintiff. PI Oliver was alarmed by a recent call in which the plaintiff raised his voice and threatened to get even. **See** Duba Decl. ¶ 5; Oliver Decl. ¶ 6.

  7. On or about March 14, 2003, Manager Duba conferred with Jeanette Moser, Manager of Human Resources and head of the USPS's Threat Assessment Team (TAT) regarding the information received from PI Oliver and how this could affect the safety of USPS employees in Gordon. Ms. Moser was also concerned and instructed Manager Duba to notify the Postal Inspection Service and the Denver Contracting Office. **See** Duba Decl. ¶ 6; Filing No. 103 Ex. 3 - Jeanette Moser Decl. ¶¶ 2, 4.

  8. On March 14, 2003, Manager Duba telephoned Gary Lund in the Denver Contracting Office and informed him of her conversation with PI Oliver. Mr. Lund suggested that Manager Duba call the Postal Inspection Service and try to listen to the tapes. **See** Duba Decl. ¶ 7.

  9. On March 17, 2003, Manager Duba briefed Perry Mitchell, a Postal Inspector with the Omaha Postal Inspection Service, on the situation and discussed the possibility of listening to the tapes. **See** Duba Decl. ¶ 8.

  10. On March 18, 2003, Manager Duba and Ms. Moser telephoned PI Oliver to listen to the tapes of his last conversation with the plaintiff. Manager Duba taped the conversation with PI Oliver, including a portion of a recorded conversation between PI Oliver and the plaintiff. Manager Duba later typed up a transcript of her taped conversation with PI Oliver. **See** Duba Decl. ¶ 9; Moser Decl. ¶ 5; Oliver Decl. ¶ 7.

  11. Excerpts from the plaintiff's conversations with PI Oliver include:

Plaintiff: So these people need to be brought to justice. . . . And they need to pay me millions. . . . I'm not going to settle for a ten thousand dollar bill. I want millions, because they have destroyed me to no end, and they've had a happy day doin' it. And you don't know our neighbor that's manager of it, he is a cocky son of a gun. And he's perfectly primed for doing something like this. And he's got little yuppies, young yuppies

|         |       |
|---------|-------|
|         | doin' it with him.  So you see why they gettin', doin' it and gettin' away with it? |

See Filing No. 103-3 Ex. 4(A) - Tr. at p. D00452.

Plaintiff: Because I, I complained enough of how I've been treated at the post office, absolutely shitty, I am the only one that's shit on, I'm tired of it, I am bone ass tired of it. ***It's going to resort to violence if you don't put an end to it.*** Because I am tired of dealing with it . . . .

*Id.* Tr. at p. D00455 (emphasis added).

Plaintiff: And ah you know, oh it's just, crazy as crazy, and what it's done to my health, what it's done to my emotions, what its [sic] to me mentally, what it's done to me spiritually.  Probably spiritually more than anything.  What it's done to my personality, I'm angry because I'm being tortured to death and I can't seem to get, ah, get the goods on the people and, and put an end to it.  ***And I want to get the goods on 'em, and they need to pay.  They need to pay for their sins.*** That's devilish to put other people in such torture and pain, and daily torture.  And I wouldn't be havin' the trouble at my work place, I wouldn't have the trouble out on the route that I do, if it hadn't a been getting my phone calls and spreading all over.

*Id.* Tr. at p. D00470 (emphasis added).

Plaintiff: I just told my aunt a night or two before that, ***the next son of a bitch that parks on my side, or drives on my side of the road I'm going to empty a gun or (inaudible) gun on 'em***, see, but they knew I couldn't carry a gun in my vehicle.

*Id.* Tr. at p. D00477 (emphasis added).

Plaintiff: Yeah, well I wished I could get a hold of somebody that could put some terrorism in some of these people, put a little fear in 'em. I want to be left alone.

*Id.* Tr. at p. D00492.

Plaintiff: And he [postmaster] treats me like crap there and, and harasses me and, ah, well, the last time I was there, he was so mean and rotten, and boisterous and argumentative, ah and loud, I, I, just couldn't talk nicely to him, I mean I did but, it wasn't, he, he didn't want me ya know, talkin', I mean I tried to just repay him, I didn't get his tone of argumented [sic] temper, no way. (inaudible) ***Those kind of people need to be dealt with and done away with, he has no fear, if he had fear at***

5

> *his job, then he was gonna be, ah to have repercussions for his actions, he wouldn't be doin' it.*

*Id.* Tr. at p. D00496 (emphasis added).

Plaintiff: I'm makin' mistakes on the route that I don't normally make, and, and, it, it's getting to the point, it's getting the best of me, and I'm gettin' angry about that also, so . . . we better . . . do something, and we better hurry. That's all I can say.

*Id.* Tr. at p. D00520.

Plaintiff: And by god, it'll be an end one way or another, if it takes violence to do it, I don't know. But I AM GOING TO HAVE RELIEF.

*Id.* Tr. at p. D00547.

Oliver: Well I tell ya Keith, and I don't want you talking like any violence here, there's no need for any of that.

Plaintiff: You're not the one that's your character and your personality is being destroyed either.

*Id.* Tr. at p. D00548.

12. Ms. Moser notified the local TAT of the situation. The TAT is a component of the Postal Service's National Workplace Violence Prevention Program that is implemented in each performance cluster and used to assist in assessing threatening situations and developing risk abatement plans that minimize the potential risk for violence. The TAT has the ability to utilize Situation Advisors, which can include Postal Service Inspectors, among others. **See** Duba Decl. ¶ 10; Moser Decl. ¶¶ 2, 6.

13. The TAT determined that a professional opinion regarding the plaintiff's statements was necessary and contracted with John Engler, Ph.D., to help further assess what harm, if any, the plaintiff posed to employees in Gordon. **See** Duba Decl. ¶ 10; Moser Decl. ¶ 7.

14. The USPS issued a Zero Tolerance Policy in January 2003, which states:

> any employee who makes a threat of physical violence will be taken seriously and the threat will be dealt with immediately and effectively. A threat is defined as any statement that indicates an intent to do bodily harm to another . . . Words or actions intended to provoke, intimidate or imply a threat may also be considered under this policy.

The Policy directs that the supervisor, manager, or postmaster in charge "will place the employee making the threat in an off-duty status without pay pending investigation and instruct the employee not to return to work until notified by management to do so." The Policy further states threats are serious offenses and removal is normally warranted. **See** Moser Decl. ¶ 19; Filing No. 103-2 Ex. 3(A) - Zero Tolerance Policy.

15. On March 20, 2003, in light of the Zero Tolerance Policy, Les Carpenter, the Manager of Transportation Contracts in the Denver Contracting Office, issued a letter to the plaintiff notifying him that he was temporarily denied access to the mail and the postal premises until such time as there was a final determination into the investigation of the statements made by the plaintiff. This letter was delivered to the plaintiff by the Officer in Charge of the Gordon Post Office. **See** Duba Decl. ¶ 11; Carpenter Decl. ¶¶ 6-7, 10; Filing No. 101-2 Ex. 1(D) - Mar. 20, 2003 Letter.

16. Both USPS policy and the plaintiff's contract provide for denial of access to the mail. **See** Carpenter Decl. ¶ 9; Filing No. 101-2 Ex. 1(A) - HCR 69384, p. B-6 ¶ h; Ex. 1(B) (same); Ex. 1(C) - HCR 69362, p. B-6 ¶ h; Ex. 1(F) - USPS Management Instruction PO-530-91-8, ¶ III(B).

17. Although the plaintiff was temporarily denied access to the mail, he was approved to assign one of his drivers (who had cleared a security check) to deliver the mail on the plaintiff's routes. **See** Duba Decl. ¶ 11.

18. On March 21, 2003, Paul Welch with the Denver Contracting Office requested that the Postal Inspection Service conduct an investigation and prepare an Investigative Memorandum relating to whether the plaintiff posed a credible threat. **See** Duba Decl. ¶ 14; Moser Decl. ¶ 11.

19. The plaintiff appealed his temporary denial of access to the mail in a letter to Mr. Carpenter dated March 22, 2003. Mr. Carpenter forwarded the plaintiff's appeal of temporary denial of access to Russell A. Sykes, Manager of Surface Transportation, CMC at USPS Headquarters in Washington, DC. **See** Carpenter Decl. ¶ 11.

20. On or about March 26, 2003, PI Oliver mailed Manager Duba two audio tapes containing the taped telephone conversations between PI Oliver and the plaintiff. Manager Duba turned the tapes over to the Postal Inspection Service. **See** Duba Decl. ¶ 17; Oliver Decl. ¶ 8.

21.     On May 1, 2003, Postal Inspector Perry Mitchell issued an Investigative Memorandum regarding the plaintiff's conduct.  **See** Carpenter Decl. ¶ 12; Filing No. 101-3 Ex. 1(G) - May 1, 2003 Memo.

22.     On May 9, 2003, the Denver Contracting Office decided to permanently deny the plaintiff access to the mail based on the investigation results and management input. **See** Carpenter Decl. ¶ 13; Filing No. 101-4 Ex. 1(H) - May 9, 2003 Letter.  Neither Manager Duba, Ms. Moser, nor the TAT were involved in this decision.  **See** Duba Decl. ¶ 19; Moser Decl. ¶ 14.

23.     USPS policy provides a specific appeal process for contractors and subcontractors when access to the mail is denied.  The policy, set forth in Management Instruction PO-530-91-8 provides appeal procedures when adverse screening decisions are made.  Specifically, the contract manager forwards appeals, along with the complete screening file to the General Manager, Surface Contracts Management Division, at Headquarters for adjudication.  **See** Filing No. 101-2 Ex. 1(F) - USPS Management Instruction PO-530-91-8, ¶ VI.

24.     The plaintiff appealed his permanent denial of access to the mail by sending a letter to Mr. Carpenter dated March 12, 2003.  It appears that "March 12" was a typographical error in the plaintiff's letter because the letter references the May 9, 2003 letter from Mr. Carpenter.  Mr. Carpenter responded to the plaintiff in a letter dated May 27, 2003, and indicated that he forwarded the plaintiff's appeal to the next higher level contracting authority for adjudication. **See** Carpenter Decl. ¶¶ 16, 17; Filing No. 101-4 Ex. I - Mar. 12, 2003 Letter.

25.     On May 14, 2003, John Engler, Ph.D., issued a report concluding the plaintiff "may be suffering from a paranoid delusional disorder, schizophrenia, and/or other psychological disorder."  In response to a question posed by the TAT regarding whether the plaintiff was a serious threat to others, Dr. Engler opined, "Although Mr. Dohse has made some veiled threats of violence, it does not appear that others are in imminent risk of danger.  However, if his condition deteriorates, it is possible that he could become violent and dangerous to others."  **See** Duba Decl. ¶ 20; Filing No. 102-4 Ex. 2(C) - May 14, 2003 Report.

26. Mr. Sykes reviewed the plaintiff's appeal. On June 11, 2003, Mr. Sykes denied the appeal based on the USPS's Zero Tolerance Policy against violence in the workplace and because the contracting officer did not abuse his discretion in making his decision. **See** Carpenter Decl. ¶ 18; Filing No. 101-4 Ex. 1(J) - June 11, 2003 Letter.

## LEGAL STANDARD

Pursuant to the Federal Rules of Civil Procedure, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); **see *Nat'l Am. Ins. Co. v. W & G, Inc.***, 439 F.3d 943, 945 (8th Cir. 2006). When making this determination, a court's function is not to make credibility determinations and weigh evidence, or to attempt to determine the truth of the matter; instead, a court must "determine whether there is a genuine issue for trial." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 249 (1986). A court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" ***Chambers v. Metro. Prop. & Cas. Ins. Co.***, 351 F.3d 848, 853 (8th Cir. 2003) (**quoting *Anderson***, 477 U.S. at 248). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and [the rule] should be interpreted in a way that allows it to accomplish this purpose." ***Celotex Corp. v. Catrett***, 477 U.S. 317, 323-24 (1986).

Additionally, Rule 56(e)(2) provides:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

**See** Fed. R. Civ. P. 56(e)(2). A party seeking summary judgment bears the burden of informing a court "of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." **Celotex**, 477 U.S. at 323 (**quoting** Fed. R. Civ. P. 56(c)); **Rodgers v. City of Des Moines**, 435 F.3d 904, 908 (8th Cir. 2006).  In the face of a properly supported motion, the burden then shifts to the nonmoving party to "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); **Murphy v. Missouri Dep't of Corr.**, 372 F.3d 979, 982 (8th Cir. 2004).  A motion for summary judgment places an affirmative burden on the non-moving party to go beyond the pleadings and, by affidavit or otherwise, produce specific facts that show that there is a genuine issue for trial.  **See** Fed. R. Civ. P. 56(e); **Janis v. Biesheuvel**, 428 F.3d 795, 799 (8th Cir. 2005).

Under this court's local rules:

> The moving party shall set forth in the brief in support of the motion for summary judgment a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law.

**See** NECivR 56.1(a)(1).

Additionally:

> The party opposing a motion for summary judgment shall include in its brief a concise response to the moving party's statement of material facts.  The response shall address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies.  <u>Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response</u>.

**See** NECivR 56.1(b)(1) (emphasis in original).

## ANALYSIS

### A.   Due Process

The plaintiff alleges he was denied access to the mails without a meaningful notice or hearing in violation of the Due Process Clause of the Fifth Amendment as incorporated by the Fourteenth Amendment of the United States Constitution.  **See** Filing No. 37 - First Amended Complaint p. 5.  The plaintiff further alleges that as a result, he "has been denied

his liberty and property rights as a citizen to have access to the mails, access to the postal premises, and to fairly compete to do business with the Federal Government." **Id.**

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This clause has two components: the procedural due process and the substantive due process components. **Singleton v. Cecil**, 176 F.3d 419, 421-22 (8th Cir. 1999) (**citing County of Sacramento v. Lewis**, 523 U.S. 833 (1998)). The fundamental concept behind any due process claim is the opportunity to be heard at a meaningful time and in a meaningful manner. **Winegar v. Des Moines Indep. Community Sch. Dist.**, 20 F.3d 895, 899-900 (8th Cir. 1994) (**citing Mathews v. Eldridge**, 424 U.S. 319, 333 (1976)). What may properly constitute due process may vary according to the particular situation. **Id.** (**citing Zinermon v. Burch**, 494 U.S. 113, 127 (1990)). To determine what process is due, a court must weigh three factors: 1) the private interest involved, 2) the risk of erroneous deprivation of such an interest through procedures used and probable value of additional procedural safeguards, and 3) the government's interest, including the function involved and the fiscal and administrative burden additional procedural requirements would entail. **Mathews**, 424 U.S. at 335.

### 1. Private Interest

"Analysis of either a procedural or substantive due process claim must begin with an examination of the interest allegedly violated, [t]he possession of a protected life, liberty, or property interest is . . . a condition precedent to any due process claim." **Singleton**, 176 F.3d at 424 (internal quotations and citations omitted). Absent such an interest, a due process violation cannot have occurred. **Id.** "[P]roperty interests protected by the Due Process Clause are not created by the Constitution, but rather by independent sources such as state law, municipal ordinance, or contract." **Id.** at 421-22.

Here, the plaintiff has a contract with the defendant. The plaintiff does not now contend any other independent interest was impinged by the defendant. The plaintiff states the USPS Procurement Manual governs all aspects of the parties' contractual relationship. **See** Filing No. 109 - Brief p. 3. The plaintiff argues that based on the terms of the contract,

11

the plaintiff should be considered to be a public employee, rather than an employee-at-will. The plaintiff also contends the parties' contract provides various procedural guarantees. The defendant maintains the plaintiff is not an employee-at-will because the plaintiff is not an employee at all. The defendant did not terminate the plaintiff's contract. The plaintiff is unable to personally perform the delivery contracts, but may hire others to deliver the mail.

In any event, to establish a protected property interest in his employment, the plaintiff must show that he could have been fired only for good cause. ***Spitzmiller v. Hawkins***, 183 F.3d 912, 916 (8th Cir. 1999). There is no evidence to support any contention that the plaintiff has a property interest to personally perform the delivery contracts. The plaintiff was not a USPS employee. Nor was he an employee of the federal government. **See** 5 U.S.C. § 7511(a)(1) (defining "employee" for purposes of removal from position). The defendant contends the plaintiff had less of an interest in his access to the mails than an at-will employee has in his employment because the plaintiff was a contractor. **See** Filing No. 104 - Brief p. 13.

The plaintiff's HCRs are agreements for mail delivery separate from the plaintiff's original grant of access to the mails. However, the contracts provide the basis for the plaintiff's expectation to access the mails beyond typical public access. The contracts specifically provide for the possibility that a contractor or subcontractor might lose access to the mails. The plaintiff's access to the mails was granted as a privilege after a security clearance, which applies only to individuals. The contracts state that all persons who carry the mail are expected to be reliable, trustworthy, and of good moral character. **See** Filing No. 101 Ex. 1(B) - HCR 69384 p. B-6 ¶ i. Additionally, the contracts provide "[t]he supplier shall deny access to the mail to any employees or personnel when required to do so by the contracting officer." ***Id.*** ¶ h. USPS Management Instructions provide for the screening of mailhandling contract employees. Specifically, "[t]he contracting officer is responsible for deciding if a contractor or contract employee should be denied access to the mails." **See** Filing No. 101-2 Ex. 1(F) - USPS Management Instruction PO-530-91-8, ¶ III(B). The instruction provides for screening and re-screening of contractor and contract employees at periodic intervals. As a contractor or contract employee, the plaintiff was subject to the Zero Tolerance Policy, which gives a supervisor or postmaster the authority to place an

employee in an off-duty status pending investigations of threats.  **See** Filing No. 103-2 Ex. 3(A) - Zero Tolerance Policy.

The plaintiff asserts, as a USPS employee, he was entitled to pre-termination due process.  To claim entitlement to pre-termination due process, the plaintiff must show that he had a protected property interest derived from a source such as state law.  ***Spitzmiller v. Hawkins***, 183 F.3d 912, 915 (8th Cir. 1999).  The plaintiff failed show he was a postal employee or otherwise had a protected property interest in access to the mails.  The plaintiff's access to the mail was terminable at the will of the contracting officer.  The plaintiff had no reasonable expectation of continued access to the mails or to personally perform the delivery contracts.  The plaintiff's private interest, not sufficient to require a pretermination hearing, is important to a portion of the plaintiff's livelihood.  However, the plaintiff was not denied an opportunity to complete his HCRs.  The plaintiff was merely denied the ability to personally perform delivery of mails under the contracts.  **Compare** ***Goldberg v. Kelly***, 397 U.S. 254, 264 (1970) (involving the plaintiff's "very means by which to live").  Accordingly, the plaintiff fails to show he had either a liberty or property interest in continued access to the United States mails.  In any event, although the plaintiff did not receive a pre-termination hearing, he received adequate procedural due process.  **See** ***Harrison v. U.S. Postal Service***, 840 F.2d 1149, 1153-55 (4th Cir. 1988).

### 2.     Process

The HCR contract provides "[t]he supplier shall deny access to the mail to any employees or personnel when required to do so by the contracting officer."  Filing No. 101 Ex. 1(B)  - HCR 69384 p. B-6 ¶ h.  USPS Management Instructions provide "[t]he contracting officer is responsible for deciding if a contractor or contract employee should be denied access to the mails."  **See** Filing No. 101-2 Ex. 1(F) - USPS Management Instruction PO-530-91-8, ¶ III(B).  Additionally, the instruction provides for the appeal process and notice of such process to the contractor or contract employees.  ***Id.***  As a contractor or contract employee, the plaintiff was subject to the Zero Tolerance Policy.  The policy gives a supervisor or postmaster the authority to place an employee in an off-duty status pending investigations of threats.  **See** Filing No. 103-2 Ex. 3(A) - Zero Tolerance

Policy.  Furthermore, the contract contains provisions for termination of the contract itself upon the default of the contractor if, for example, the supplier has "violated Postal laws and regulations."  *Id.* Ex. 1(C) - HCR 69362, p. H-3.

The plaintiff was placed in an off-duty status by his initial denial of access to the mails, pending an investigation of the allegations that the plaintiff had made threats of harm against postal employees.  The defendant engaged in an investigation of the allegations and an investigation into the credibility of the threats themselves.  Both the initial denial of access and the final denial of access to the mails were subject to an appeals process of which the plaintiff availed himself.

In this case, there was no statutory or contractual requirement that the plaintiff be given a hearing.  The plaintiff received post-termination procedure in the form of appeals of the denial.  This court will not determine whether the defendant made a correct decision. "A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures." *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998).  However, the court will weigh the plaintiff's private interest against the other *Mathews* factors.

The risk of a permanent erroneous deprivation is small.  The defendant gave the plaintiff notice of the deprivation and conducted an investigation into the allegations and the severity of the threats.  The decisions to deny the plaintiff access to the mails were not made by the plaintiff's immediate supervisors or postmaster, but by others.  The plaintiff appealed the decisions.  The plaintiff received independent and neutral appellate reviews. There is no evidence before the court suggesting additional procedural safeguards would have altered the decision to deny the plaintiff access to the mails.

The court must also consider the defendant's "interest in insuring the efficient processing of the mails, and the burden on that interest which would occur were additional procedural safeguards required whenever a contract employee's decertification occurred." *Harrison*, 840 F.2d at 1154 (concluding "those concerns weigh heavily against the imposition of such additional safeguards").

> [T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with

> dispatch . . . . Moreover, a requirement of a prior evidentiary hearing would impose additional administrative costs, create delay, and deter warranted discharges.  Thus, the Government's interest in being able to act expeditiously to remove an unsatisfactory employee is substantial.

*Id.* (**quoting** *Arnett v. Kennedy*, 416 U.S. 134, 168 (1972) (footnote omitted) (Powell, J., concurring in part and concurring in the result in part) and **citing** *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 896 (1961); 39 U.S.C. § 1001(e)).  The *Harrison* court also stated that "[b]y virtue of section 4(g) of the Basic Provisions, the Postal Service's 'prerogative to remove employees whose conduct hinders efficient operation' extends to [the plaintiff] even though he himself is not a government employee." *Id.*  The defendant's interests in efficient delivery of the mails outweigh the plaintiff's interest in access to the mails under the circumstances presented to the court. Accordingly, the plaintiff received all the process due him after his denial of access to the mails.  Therefore, the defendant did not violate the plaintiff's rights under the Fifth Amendment as the plaintiff alleges.

### B.     Protected Speech

The plaintiff argues, in his brief, that he was terminated for engaging in constitutionally protected speech.  A public employee's speech is protected by the First Amendment if it is on a matter of public concern.  *Connick v. Myers*, 461 U.S. 138, 146 (1983).  In order for speech to be on a matter of public concern, the speech must "be fairly considered as relating to any matter of political, social, or other concern to the community." *Id.*   If it is, the plaintiff's right to comment on those matters must "be balanced with [the defendants'] interest in 'promoting the efficiency of the public services it performs through its employees.'"   *Sparr v. Ward*, 306 F.3d 589, 594 (8th Cir. 2002) (**quoting** *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)); **see** *Bowman v. Pulaski Co. Special Sch. Dist.*, 723 F.2d 640, 644 (8th Cir. 1983).  Whether speech is "protected speech" under this approach presents a question of law for the court. *Connick*, 461 U.S. at 148 n.7; *Washington v. Normandy Fire Prot. Dist.*, 328 F.3d 400, 404 (8th Cir. 2003).  Additionally, an employee who communicates privately shares constitutional protections.  *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979).

The plaintiff contends the only evidence against him was statements made in private. Private speech he did not act on. However, the statements made by the plaintiff to PI Oliver are not statements similar to those made by the plaintiff in **Givhan**. In **Givhan**, the plaintiff voiced "petty and unreasonable demands" to his employer, in private. *Id.* at 413. In contrast, the plaintiff, here, made statements to a third party, not his employer. Additionally, the plaintiff's statements were not of a public concern, but of a purely private nature. Furthermore, threats are not constitutionally protected speech. **See *Watts v. United States***, 394 U.S. 705, 707-08 (1969); **see also *Pulaski County***, 306 F.3d at 622. For these reasons, the plaintiff's statements to PI Oliver are not protected by the First Amendment. Moreover, the plaintiff failed to raise a free speech claim in his complaint and raised the issue only in his response to the motion for summary judgment. Accordingly, the plaintiff's allegation that the defendant denied him access to the mail in violation of his First Amendment rights must fail. Upon consideration,

**IT IS ORDERED:**

1. The defendant's Motion for Summary Judgment (Filing No. 100) is granted.

2. Pursuant to Fed. R. Civ. P. 58, a separate judgment will be entered on this date in accordance with this Order.

Dated this 29th day of January, 2008.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge